Good morning, Your Honor. Serge Stelmi on behalf of the appellant. I'd like to reserve three minutes for rebuttal. Your Honor, this appeal turns on essentially two problems. First, whether the verdicts that were issued by the jury were against the weight of the evidence. And second, whether the evidentiary rulings, jury instructions, or discovery orders by the court affected the appellant's substantive rights. We submit that on both problems the case should be reversed. First, addressing if I might, whether the substantial evidence supported a verdict on the breach of contract claim. It did not. And it did not, and the clearest indication that it did not is the following. It is undisputed and unrebutted that State Farm failed to pay contractors overhead in profit as part of the damages awarded or that they paid to Mrs. Varanand. They acknowledged they didn't do that. They acknowledged that that was not industry practice at the time. They acknowledged that they subsequently were challenged on their practice of withholding it by the Department of Insurance and they subsequently aborted and avoided that practice and began to pay contractors overhead in profit. They never paid Mrs. Varanand. All of that is in the record. Consequently, the mere failure to have paid that constitutes a breach of contract, and a verdict that there was no breach of contract is simply wrong. In addition, the failure to pay for the, to conduct an adequate investigation of the full extent of damage is also clear and unequivocal from this record. The adjusters that went out to that property saw a crack in the slab in the garage extending into the property, into the house. They did not conduct a full investigation of that crack. Their own guidelines, State Farm's guidelines, and the training they provided their adjusters made clear that where a crack extends, you must lift floor coverings, you must open walls, and you must examine for the full extent of damage. They did not do that. The failure to conduct a full investigation of the extent of damage is a breach of the insurance contract. Consequently, the determination that there was no breach of contract cannot stand. Now that is based on the evidence which was submitted. There was also evidence which was excluded, which would have established, in addition to that which has been shown, the further breaches of contract. What evidence was excluded that affects that? First, State Farm's knowledge that their inspection had been inadequate and that it should be re-inspected. And this is the notes in the file, recommendations by State Farm's own attorneys, that a further inspection should be conducted. That evidence was excluded. Similarly, evidence regarding Mr. Singh's efforts on behalf of Mrs. Varanat to get State Farm to come out and re-examine the property with a specific identification of additional damages that had not been covered by the earlier estimates. That was excluded. Had it been allowed, we would have been able to show the full extent of the damage to the property. What ground was that evidence excluded? The judge excluded that evidence with respect to Mr. Singh's efforts on the grounds that he was not acting on behalf of Mrs. Varanat. That's not supported by the testimony. What did he have, what did he, what had to be shown in order for him to be authorized to act on her behalf? What the judge said is there had to be a written designation in order for him to have acted on her behalf. That's not what the law requires. The law simply requires that any person acting under the authority of law for another can pursue a claim on behalf of a claimant. The evidence was that Mr. Singh contacted Mrs. Varanat and identified additional damage. She authorized him, through her attorney, go to State Farm and deal with them over it. When he asked them to come out and re-inspect the property, they refused. He went back again, they refused again. He hired an independent adjuster who made several attempts to approach State Farm and encourage them to come back and inspect the property. Each time, they refused to come out. Did he present any evidence of a written assignment or written authorization to him from Mrs. Varanat? And why not? There was no written authorization at that time. And why wasn't there a written authorization? We didn't believe that it was required. Isn't the insurance code of California, doesn't it require that someone acting for an insured, as against the insurance company, have a written authorization? It requires that certain classes of people acting on behalf of a claimant are required to have a written designation. It doesn't require that all persons acting on behalf of a claimant have a written designation. And who's in the class for which the written authorization is required? An adjuster, family members, I don't know what the third. But in other words, people with some close relationship. Well, not necessarily. A family member? A family member certainly is a close relationship, but not necessarily all persons. An attorney, for example, does not have to have a written authorization. An attorney is not necessarily a close relationship to the party, but nevertheless, is entitled to do so because under law, he is an agent of the client, and he has a right to pursue the claim on behalf of the client. But the law doesn't limit agency relationships to an attorney or require a license at law in order for that to occur. Did State Farm ask for a written authorization? They never did. And it didn't occur to Mr. Singh that a written authorization might help? If they had identified that that is what they wanted, we would have obtained one. I asked a slightly different question. It did not occur to Mr. Singh that that might have helped? No, it did not. And why not? I mean, it seems so obvious. Well, if you go to an insurance company and say, please come out with respect to this particular claim. You have examined it on four separate occasions, and you've still not found all of the damage. We've got more damage here we'd like you to look at. Yes, but you're not the policyholder. And you call up and you say, well, I'm Mr. Singh. I realize I'm not the policyholder. The policyholder is Ms. Varanand. I'd like you to come out and investigate some damage. And they say, well, I don't think you're the policyholder. It would occur to one, I think, you should get something from the policyholder and say I'm acting on behalf of the policyholder. Had the insurance company indicated that they wanted such an authorization? But did they indicate that they thought that Mr. Singh was not the policyholder and that that was the reason? That is one of the reasons they did, yes. Well, the reason the attorney is not required to have a written authorization is because the insurance regulations, 2695.2, defines a claimant as any person who asserts a right of recovery under a surety bond, an attorney. So the attorney is the claimant. Therefore, for somebody who is acting on behalf of a claimant, such as an insurance adjuster or a member of the family, they do need written authorization. That is true. The distinction, however, Your Honor, I would submit, is that the statute does not say attorney at law. It does not say an attorney licensed to practice in the state. It simply says attorney. And the term attorney, as applied in the law, is broad enough to encompass any person, including someone who is an attorney in fact, an agent. Is that the way it's interpreted by the insurance regulators in California? There is no case that we know of that we have found that specifically restricts the term attorney as used in that regulation to an attorney licensed to practice law in the state. Is there any law that you know of that expands it to be attorney at fact, in fact? Well, we have looked at the question of what constitutes an attorney or someone acting pursuant to law, because that was the clause of the insurance regulation that we were concerned with. And in that context, based on the research that we did, it was clear that agency rules applied and that anybody who, by operation of law, had the right to act on behalf of another was authorized under law. And we submit that that would include Mr. Singh. Now, but let's get past this for a second, because if I might submit to you, Your Honor, whether or not Mr. Singh was being recognized by State Farm as an agent of Mrs. Varanand, State Farm nevertheless had an independent duty to Mrs. Varanand to go back and inspect that property when it came into knowledge of facts from any source that its prior adjustment may have been incorrect or incomplete. Even when they had no communication from the policyholder? Even if they had no communication from the policyholder. And we cited the authorities, Your Honor, that duty in a first-party case or in a third-party case of an insurance company is the same. Now, at this point, when you argue that they had an independent duty because this information had come to their attention, how many times had they paid or adjusted claims from Mrs. Varanand? Three? Four, I think. Three or four already. I think it was four. So now, based upon a communication from a non-policyholder who refuses or at least fails to provide any evidence that he's – any written evidence that he's acting on her behalf, you contend they've got an obligation to come out after they've paid her four different – on four separate occasions? Especially because they've paid her four times. Your Honor – The more they pay, the more their obligation? The more times that they go back to that property and discover that they hadn't fully found all the damage, they should be on high alert that maybe it's time to go back again and look some more. And maybe it's time to do a further, more thorough investigation to find all of the damage. In this particular case, it was clear after the first time that they went out that the investigation was shoddy. Their own records reflect that. That's criticism of the first adjuster's estimates as being shoddy. They go back. They acknowledge they made a mistake. They pay her more. She identifies additional damage. They go back. They say, yes, you're right. They pay her more. She comes back to them and says, no, you've underestimated that damage. It's going to cost much more than that. Take a look at what my contractor says. They pay her again. All of this while they fully knew that there was a crack in the slab that extended into the house under the laundry room, that there was plumbing in the slab that had been broken, that they had under their own guidelines the duty to pull up floor coverings to fully investigate that, to when there's bulging in the drywall, to take off the drywall and examine how much structural damage, if there was any, any other displacement of interior wall machinations. They knew they had to do those things. They didn't do any of them. Now, Mr. Stankontax. You said just a moment ago that there was one revisit occasioned by an estimate you got from her contractor. Yes. Now, I grew up in a construction business, so with that background, didn't that contractor's estimate include profit and overhead? I believe it did, and they didn't pay it. They just refused to pay it? They just refused to pay it. They said State Farm's practice in those days was we'll pay it when you do the work and incur it. That's not the law. The law is that they have to pay the full amount of the damage necessary or the amount necessary to repair it. No contractor would do the job without profit and overhead. Consequently, they underpaid the claim. They acknowledged that. They subsequently changed that practice, and that's why the verdict that there's no breach of contract cannot stand. Similarly, the verdict that there's no breach of the covenant of good faith and fair dealing cannot stand in the face of the abundant evidence that the investigation was poor. They knew it was poor. They knew what they were required to do. Their own guidelines established what they were required to do, and they didn't do it. There's no way that in the face of that record evidence from their own records, compounded by the additional evidence that Mr. Kubala, Mr. Singh and Mrs. Vernon's independent adjuster had gone to them and said, look, there's far more extensive evidence. And, by the way, you didn't pull off the floor coverings. We did. And that crack extends all the way across the family room into the kitchen. Talking about the evidence that was presented by the claimant, the jury verdict substantially was on the basis that there was no earthquake damage, and this was all due to earth movement and settlement independent of earthquake damage. Right? I don't think that's right, Your Honor. Well, indulge me for a second. Mr. Wendt was the plaintiff's engineering expert. Didn't he testify that he saw no earthquake damage? Mr. Wendt was not the plaintiff's expert. Mr. Wendt was a third-party witness called by the defendants. Mr. Wendt was an engineering consultant who inspected the property on behalf of the plaintiffs, but wasn't called in the plaintiff's case in chief as an expert. Oh, I get it. So the plaintiff went out and got an expert and got a report and then didn't call him at the trial. And the defendant, perhaps suspecting that there might be some good stuff there, called Mr. Wendt. No, that's not correct. And got the stuff. That's not correct either. But Mr. Wendt, regardless, originally sought out by the plaintiff, found that there was no significant earthquake damage and noted none in his report. True? True. All right. Second question. And let's clear this up. This is a question that occurred to me. Mr. Singh suffered a summary judgment against him on the basis that he had no standing because he was not a party to the insurance contract. Has there been an appeal from that? No. Okay, fine. Let me address it if I might, Your Honor, Mr. Wendt's status. When Mr. Singh entered into the contract to purchase the property, he had an independent inspection done. The inspection came back with a recommendation that they have a soils expert examine the property. Mr. Wendt was that soils expert. He was engaged in the context of purchasing the property to evaluate it in the first instance. He looked at the property. He identified, and he did only a visual inspection. He did no soils testing. He did no bores. And he did no internal inspection, though he did walk through the house. His response was, I don't see any significant, and the term is significant, earthquake damage. He didn't say that there was no earthquake damage. In fact, Let me read it to you. Did you see any evidence of earthquake damage during your inspection of the Singh property? Answer, no, I did not. Question, if you had seen any significant earthquake damage, you would have noted that in your report. Would you have not? Answer, yes, I would have. So his direct testimony is he didn't see any evidence of earthquake damage, and had he seen any significant earthquake damage, he would have noted that in his report. The first answer, Your Honor, is inconsistent with his report itself, which does not talk to any earthquake damage but significant earthquake damage. And the second question relates specifically to what he is consistent with his report, namely that if he had found significant earthquake damage, he would have identified it. He did not ever say in his report that there was no earthquake damage. In fact, But he did say that the damage to the house was caused by ordinary earth movement. And he also testified that such ordinary earth movement can be accelerated and increased by the effect of an earthquake. Mr. Siddiqui, plaintiff's expert, Mr. Osteros, Dr. Osteros, the defendant's expert, Randall Wendt, all of the people, three adjusters on behalf of State Farm, went to that property. And there's no contest. Everybody agrees that the building suffered some, the property suffered some earthquake damage. It could be accelerated by earthquake damage. But in the event, what he says, this movement appears to be the result of fill consolidation, lateral creep of fill soils on the edges of the building pad or a combination of fill consolidation and lateral creep. Signal by its absence is the word earthquake. But further in the examination, Your Honor, that's his report. That's correct. But in the examination and on cross, we were able to identify to him that the amount of soil under the house was only about two inches. It sat on bedrock. And the extent of consolidation would have been very limited because of that. And he also testified that soil consolidation, fill consolidation can be accelerated by earthquake exacerbating damage. Now, it's still fill consolidation that's caused the damage. But the cause is the earthquake now because it is not just natural fill consolidation. When experts are cross examined, they're very careful to say what can be possible causes that other than they've observed. Because if they didn't do that, they wouldn't be very good in giving on cross examination, which is a hallmark of being credible. But one thing is saying that is a possible cause. And the other thing is saying it occurred in this case. And we're very clear that he said it didn't occur in this case. Well, Mr. Wynn didn't do any soils testing. You can attack his foundation's credentials as to his credibility. That's quite true. I wholeheartedly agree, Your Honor. But my focus at this stage is to point out why the verdict. Where there's disputed evidence, we understand. The jury has a right to make the decision. You know, I think we have your argument at hand at this point. Why don't we hear from the other side and let's save some time for rebuttal for you. Thank you. May I please report Clark Holland on behalf of State Farm. Thank you, Your Honors. I believe that Mr. Stoney has fundamentally missed the issues in this case. There was overwhelming evidence by not only experts previously retained by Mr. Singh, but obviously the experts retained by State Farm, that this house in fact sustained less earthquake damage than State Farm actually paid for. We were able in discovery to uncover photographs and other evidence that demonstrated that 90% of the damage to the driveway, the damage to other areas, was in fact long-term earth movement damage. We had pictures from prior to the earthquake that Mr. Singh's own experts, when I showed them the photographs, said, yeah, that's the damage I saw and that needs to be completely repaired. And they were quite surprised when I then showed them that those photographs were taken in 1992 and 1993, a year prior to the earthquake. This is a situation where we had overwhelming evidence that the earthquake caused less damage than State Farm paid for. Mr. Stoney in his opening talked about the crack in the slab. Ironically, the crack was one of the biggest undoings of the plaintiff's case because when that crack was uncovered, what was found inside the crack in the laundry room was a piece of wood shoved in the crack, on top of which was linoleum floor, that Mrs. Berenand said was in that laundry room in the 1980s when she bought the house and was still in the house after the earthquake. And yet there was no evidence that that linoleum floor was damaged in any way. And yet when they pulled it off, they see a big crack in the concrete and a piece of wood stuck inside the crack. Voila. Any rational jury would then decide clearly that crack wasn't caused by the earthquake because the piece of wood didn't jump in it after the earthquake. Would you kindly address Mr. Stoney's first point in that he says there is evidence which cannot be ignored and is sufficient for a new trial, that State Farm did not pay the profit and overhead figures on the contractor's estimates and therefore did not fully pay Mrs. Berenand. I indeed would like to address this, Your Honor. First of all, in their opening brief, they didn't raise this issue at all. They didn't cite a single case in their opening brief. They didn't argue this issue to the jury. They didn't ask for a jury instruction on this subject. So the first time we saw the case site was in their reply brief. So I think it's important to understand that this is a late comer, but I have lots of points to discuss on this. First of all, there's the California case of community assisting recovery versus Aegis, which we cited in our brief for a completely different reason. It's at 92 Cal Act 4th 886. The court talks about the difference between an actual cash value adjustment and a replacement cost adjustment and specifically says that it's the insurer that carries the initial responsibility to determine the actual cash value. If the insurer then offers replacement costs less depreciation, the insured may demand appraisal. The insured never demanded an appraisal in this case. The case cited by Mr. Sony for the proposition that we should have paid overhead and profit was Salison versus State Farm, and the court specifically said in Salison that it doesn't support the position that contractors' overhead and profit should always be paid and automatically included in the payment of actual cash value and damages. Directly contrary to Mr. Sony's position is a case called Snellen versus State Farm, and that's at 675S1064. But let's get right to the heart of it. Mr. Sony said that he, Mrs. Varinan, submitted evidence of what it would cost to repair, and I commend the court to look at, for instance, Exhibit 379 at page 4255, which is an estimate Mrs. Varinan got from Pacific Design for the repair of the driveway and the brick for $28,673, which included overhead and profit. A lot of contractors fold their O&P into their estimate. They don't set it out so you know how much they're making. Some contractors do, some don't. This estimate for $28,673 included overhead and profit. State Farm paid Mrs. Varinan $42,000 for that same item as shown in Exhibit 215 at page 4104. Mr. Singh went out after he bought the house in 1996 and got his own estimate for the replacement of that driveway. Lo and behold, Exhibit 390, page 4265, an estimate by D&M Construction for the driveway, including the brickwork, with overhead and profit, $16,460. So the jury saw all this evidence that, in fact, State Farm's estimate was the highest estimate for this work. So all this talk about overhead and profit is absurd. State Farm's own payment was higher than two estimates that included overhead and profit for the same work, and the driveway represented fully half of the damage that State Farm paid for. There's absolutely no evidence whatsoever that State Farm should have, on top of already competent estimates, added some artificial overhead and profit. Now, is it this driveway that you're contending afterwards you discover really was in that condition pre-earthquake? Indeed, Your Honor. The very same driveway that we paid her $42,000 for, we get photographs after the fact showing identical cracks. And again, Dr. Ostros showed the photos, showed the before and after photos. You couldn't distinguish the 1992 crack from the 1994 crack. They were the same crack, and yet State Farm paid for it. Any questions of the authenticity of the earlier photographs? It wasn't challenged in one iota. And, in fact, Mr. Cabali even admitted, yeah, that's what the damage looks like. His cross-examination demonstrated that the damage he saw was, in fact, pre-existing damage. This argument about Mr. Singh having a right to present Mrs. Varanand's claim is quite incredible. Mr. Singh would have you believe that California law requires Mrs. Varanand's son, her own son, to have a written authorization. And yet, somehow, some third party with no connection at all to Mrs. Varanand can come along and say, we represent her, State Farm. Please talk to us. Quite an anomaly when a situation where we're State Farm to simply say, okay, we'll take your word for it. Mrs. Varanand would be the first one here saying, you just violated my privacy rights. How dare you? The insurance code, 791.1.3, precludes State Farm from exchanging any information about a policyholder without an express written authorization from the policyholder, Sarah Varanand. So not only was State Farm required by the regs not to deal with Mr. Singh, they were required by other code provisions not to talk to him about her claim. And Mr. Kubala, who is a public adjuster, he knows the rules. He knows the adjusters. He's the one who was communicating to State Farm on behalf of Mr. Singh. If anyone knows that he has to have a written authorization, it's Mr. Kubala. And Justice Beyes simply read from the regulations that the judge may have. There's no justice in the Ninth Circuit. They had to demonstrate that they had a written authorization. They didn't. Knowing full well that this was going to be a problem, after they filed suit against State Farm, they finally get an assignment from Mrs. Varanand in writing when they threatened to sue her. That was the only time. And Mrs. Varanand testified at the trial about her unwillingness and her lack of authorization. This was not a situation where State Farm took advantage of anyone. In fact, we were compelled by law not to communicate with people other than Sarah Varanand about her claim. Mr. Holland, would you please address the contention of Mr. Sami that there was a breach of the implied covenant of faith and fair dealing in the failure to conduct full investigation, including a rejection of relevant evidence that State Farm had knowledge of the inadequacy of the investigation, such as evidence by the State Farm attorneys note to that effect? State Farm is obligated to investigate a claim sufficient to pay what is owed under the policy. That's the scope of the investigation. There's nothing in the regulations or the law saying that you have to pull up this carpet or that carpet, that you have to do anything other than make sure you do what's necessary to pay what you owe. State Farm absolutely did that. In fact, I'll have to say that to the extent State Farm's investigation originally was at all inadequate, it was inadequate only in its failure to uncover the fact that most of this damage was preexisting. So to the extent that there was any inadequacy at all in the investigation, and let's remember that State Farm was dealing with 100,000 Northridge earthquake claims, it's hardly the time to go into discovery to try to find out the 20-year history of a property. You go out there and you look and you pay what you think is owed. How is it that there were four separate payments to Mrs. Varanand? Well, this is a misnomer. State Farm went out there the first time, and their estimate was above $50,000. Specifically left out of that estimate was the pool and the brick work because everyone acknowledged that State Farm didn't have the sophistication to know how much the pool and the brick work around the pool would cost, and Mrs. Varanand said, my son will go out and get an estimate for that and get back to you. So the first visit, again, you're getting up over $50,000. The second was simply that estimate that he had already promised to get, so that was another, I think, $13,000, $14,000. And then as part of the return visit to pay or to evaluate that additional estimate for the pool, State Farm said, you know, we didn't include enough for the brick work that surrounded this very elaborate driveway. We're going to increase our estimate. This wasn't a complaint by them. They weren't saying, you didn't pay us enough. State Farm noticed this when it went out that second time and said, we need to add something for this, and they did. So was that additional, was that number three or was that number two? That was number three. It was two and three, in effect, in one visit. And then there was one very minor issue, I think having to do with the maid's bedroom. It was about a $600 item for glass that had broken as a result, and she submitted an estimate. She said, hey, I got this fixed. Here's the estimate, and State Farm paid it. This is not unusual at all. This wasn't her saying, I have an engineer and you missed all this damage. State Farm didn't miss any of the damage. State Farm saw it all. It's simply that it took a couple of times to get estimates back from the policyholder, who, don't forget, has the duty to present the client. Was this a cash, the actual cash value of settlement rather than a replacement value? It was, indeed. And, in fact, Mrs. Varanand admitted that the policy required, in order to get replacement costs, that she actually replaced, she'd do the work. She admitted that she didn't do the work. She went out and got estimates for the driveway. She went out and got estimates for other things, and she simply decided, I just don't want to waste time with this. I'm going to take my $70,000 and I'm going to sell the house. And she did. And, by the way, this very court in Maryland Casualty v. Knight at 96F3-1284 specifically held that a policy requiring actual replacement to get replacement costs indemnity was absolutely valid. And the court in Myers v. Allstate at 989F-1250 specifically talked about the fact that the 180-day requirement, i.e., that you had to replace within six months, was also a valid condition, both conditions within the State Farm Policy. Mrs. Varanand never replaced. She never disputed the amount. And the reason she never disputed the amount was that the estimates she herself went out and got at the time were less than State Farm paid her. So it's no wonder that she would dispute or not challenge that issue. Thank you, Your Honor. You saved a little time. Thank you, Your Honor. Your Honor, all the witnesses that testified at trial acknowledged that the property suffered some earthquake damage. They really didn't know the extent of the damage. And there's no question that State Farm paid for some of the damage. The issue is whether they paid for all of the damage. Counsel admits their obligation was to conduct a satisfactory investigation to unearth the extent of the damage to pay for it. They conducted their initial investigations. They determined the amount of damage. Under their assessment, they did not ask the insurer to go out and determine the extent of the damage. They undertook that responsibility. When they did so and did not pay for the contractor's overhead and profit, that was a breach of the contract. Now, you're over time, maximum a minute from now, so govern your argument accordingly. Your Honor, I want to address the Department of Insurance issue, which is a very significant issue because the result of the evidentiary rulings with respect to that, as well as the discovery orders with respect to that, effectively gutted the plaintiff's ability to show a pattern in practice. Is this really rebuttal? I don't remember him saying a word about this in his comments. No, it isn't, Your Honor. Isn't this rebuttal? Isn't that what you're doing? That is certainly so. We ran out of time on the front end, and it was reserved. I will limit myself to rebuttal as you require. The duty to investigate, Your Honors, is an independent duty. When they have knowledge of damage, they have knowledge of damage, whether it came from Mr. Singh or from the independent assessment when they came to the property and looked at the quality of the brickwork. They had knowledge. They had a duty to conduct that investigation. With respect to the agencies, Your Honor. I think we've heard this. I think it's in the briefs, and we thank you. The last argued case, Varanam v. State Farm Insurance Company, is now submitted for decision. The last case on the calendar, Lon v. Allstate Insurance, has been submitted on the briefs, and we stand in adjournment. We'll be back tomorrow at 9 o'clock. Thank you. All rise. This court for this session stands adjourned. Go ahead. I've got to pick up this. I've got to pick up this. Thank you. Thank you.
judges: T.G. Nelson, W. Fletcher, Bea